IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  1:16-cv-02425-KLM

DOMINIC GENE VARGAS, ELIZABETH ANN VARGAS, AND JOHN ADAM VARGAS,

Plaintiffs,

vs.

FISHER SCIENTIFIC COMPANY, L.L.C., a Delaware Limited Liability Company,

and

AQUAPHOENIX SCIENTIFIC, INC., a Pennsylvania Corporation,

Defendants.

---

## AMENDED COMPLAINT IN TORT FOR DAMAGES

---

Plaintiffs, Dominic Gene Vargas, Elizabeth Ann Vargas, and John Adam Vargas, by and through their attorney, James A. Cederberg of Cederberg Law Firm, P.C., state for their Amended Complaint in Tort for Damages:

### GENERAL ALLEGATIONS

1.    On or about September 14, 2015, at or about 8:00 a.m., the plaintiff Dominic Gene Vargas was a student at Strive Preparatory SMART Academy at 3201 West Arizona Avenue in Denver, Colorado. At the said time and place, Dominic Vargas suffered severe burns when he was struck by burning methanol

1

from a 4.0 liter plastic bottle of Lab Grade Methanol with the brand name "Fisher Science Education," catalog item number S25426A.

2.      The date of birth of Dominic Gene Vargas is November 16, 1997. At the time he was injured, the plaintiff Dominic Gene Vargas was a minor.  He has since reached the age of majority.

3.      The plaintiff Elizabeth Ann Vargas is the mother of Dominic Gene Vargas.

4.      The plaintiff John Adam Vargas is the father of Dominic Gene Vargas.

5.      Under Colorado law, the parents of a minor are legally responsible for the medical expenses of their minor child, and are therefore entitled to recover medical expenses incurred on behalf of their minor child from a tortfeasor that caused the child's injuries. Accordingly, plaintiffs Elizabeth Ann Vargas and John Adam Vargas bring their claim for medical expenses and related expenses incurred on behalf of their son, Dominic Gene Vargas.

6.      The said 4-liter bottle of methanol was manufactured, fabricated and packaged and sold by the defendant AquaPhoenix Scientific, Inc. for marketing, distribution and sale by the defendant Fisher Scientific Company, L.L.C.

7.      Defendant AquaPhoenix Scientific, Inc. is a Pennsylvania corporation.

8.      The said 4-liter bottle of methanol was manufactured within the meaning of Colorado Revised Statute 13-21-401, marketed and sold by the defendant Fisher Scientific Company, L.L.C.

9.      Defendant Fisher Scientific Company, L.L.C., is a Delaware corporation authorized to do business in, and doing business in Colorado, with a facility in Denver, Colorado.

10.     Upon information and belief as described in the facts alleged above, defendant Fisher Scientific Company, L.L.C. is the corporate entity responsible for the condition of the 4-liter bottle of Lab Grade Methanol that is the subject of this claim.

11.     Also upon information and belief, defendant Fisher Scientific Company, L.L.C. is the corporate entity that conducts business under the brand name Fisher Science Education.

12.     Fisher Science Education, from all reasonably available public information, is not a corporate entity, but is merely a brand name used by defendant Fisher Scientific Company, L.L.C.

13.     The subject bottle of methanol was designed, specified, marketed and distributed as a product for classroom use by the defendant Fisher Scientific Company, L.L.C. Specifications by Fisher Scientific Company, L.L.C. included the packaging without a flame arrestor.

14.     The defendant Fisher Scientific Company, L.L.C. sold products to schools throughout the United States, including in Colorado.

15.     The defendant AquaPhoenix Scientific, Inc. manufactured, fabricated, processed, packaged, and labeled products for the defendant Fisher Scientific Company, L.L.C., including the subject bottle of methanol for distribution and sale throughout the United States, including in Colorado.

16.     The subject bottle of methanol was included in school laboratory supplies sold on or about June 6, 2014 pursuant to Fisher Scientific Invoice Number 7664677 to Strive Preparatory SMART Academy, hereinafter "Strive Prep."

3

17.     The purchase was made on behalf of Strive Prep in Colorado, by Alberto Rodriguez. Alberto Rodriguez had no expertise in laboratory or classroom chemicals and was placing the order pursuant to his duties to procure various supplies and items for the operation of Strive Prep.

18.     The contents of the Strive Prep purchase order were generated by use of a service provided on the Fisher Scientific web site known as Lab Outfitter.

19.     The Fisher Scientific Lab Outfitter service worked as follows. The customer is prompted to enter the general subject of the class being taught, for example "high school chemistry", and the number of students. The Lab Outfitter function then generates a recommended list of supplies.

20.     The vast majority of the items purchased by Strive Prep pursuant to Fisher Scientific Invoice Number 7664677, including the 4-liter bottle of methanol, were on the list recommended by the Fisher Scientific Lab Outfitter program.

21.     Methanol is a highly volatile and extremely hazardous substance. Its hazardous characteristics include, but are not limited to, its flashpoint and the range of its explosive limits when its vapor mixes with air, and the volume of vapor that it produces the rate at which it vaporizes, and the fact that the vapor is heavier than air.

22.     According to the defendants, the subject methanol has a flash point of 12°C (53.6°F), an evaporation rate of 5.2, Vapor Density of 1.11, and explosion limits of Upper 31.00%/Lower 6.0%.

23.     Because of these physical properties, methanol is more volatile and ignites more readily than other comparable substances with which a user may be

familiar, such as petroleum-based fire starter liquids.

24.     Methanol is also more volatile than certain other volatile substances sometimes found in consumer products, including ethanol.

25.     One of the hazardous and dangerous aspects of methanol of which consumers and users are generally unaware is its propensity for vapors to readily ignite and for the ignition to travel rapidly to the source of the vapor.

26.     In the case of a plastic bottle of methanol, when the vapor ignites, the fire or explosion travels instantly to the bottle, immediately pressurizing the bottle and causing burning methanol to spew violently from the bottle in a "flame thrower" effect over distances of several meters.

27.     This effect of the hazardous properties of methanol is also generally unknown to and unexpected by users and consumers.

28.     In September of 2014, and for more than 15 years before 2014, the status of science teachers' safety training was such that a total absence or lack of safety training for science teachers was widespread in America's schools.

29.     Prior to September of 2014, laboratory safety advocates, teachers' organizations and others identified and reported, in published studies, publicity campaigns, articles and interviews, a glaring and widespread lack of safety training among high school teachers. Many of these public statements were made or issued in the context of reaction to classroom methanol fires substantially similar to that which injured the plaintiff Dominic Gene Vargas on September 15, 2014.

30.     Scholarly studies published in 2006 and before reported that, in the vast

majority of states, there were no requirements whatsoever that high school

science teachers undergo any laboratory safety training, and that where any

requirements did exist, they were frequently inadequate.

31.     For at least 15 years prior to September 15, 2014, scholarly articles and

informed commentary by laboratory safety experts identified, both wittingly and

unwittingly, several causes for laboratory injuries in general, and methanol

injuries in particular, including but not limited to: lack of laboratory safety training

in colleges where teachers are educated; lack of requirements for laboratory

safety training for teachers; lack of funding and teachers' time for lab safety

training where such training is offered; trends toward more entertaining or "wow

factor" activities in teaching science; lack of funding for necessary safety

equipment; deployment of teachers into science classes who are either not

trained in the particular field, e.g. chemistry, or not trained in science at all; and a

culture of lack of understanding of how to conduct a system safety analysis or

identify and eliminate or minimize hazards, or to adequately assess risks versus

benefits.

32.     The information described in paragraphs 39 through 42, above, appeared

repeatedly in multiple credible and reliable sources that were and are sources

that a reasonable person or entity concerned with school laboratory safety or

introduction of hazardous chemicals such as methanol into classrooms should

read and be familiar with, including the defendants.

 33.     Teachers in high school classrooms, including science classrooms,

constantly face innumerable inherent distractions, including long learning curves

6

for new teachers or new subjects, lack of preparation or clean up time,

inconvenience and issues associated with interruptions of the task at hand during

class, and student behavior, both good and bad. Student enthusiasm and

engagement, and teacher enthusiasm and desire to be engaging, can and do

distract from attention to safety.

34.     Prior to September 15, 2014, the hazards and extreme danger of

methanol in school classrooms and the foreseeability of teacher use or misuse of

methanol had been demonstrated over and over again in numerous tragic

incidents that caused serious and catastrophic injuries to students and which

were widely reported in the popular media and in education and chemical

industry publications. These prior incidents were substantially similar to the

September 15, 2014 methanol fire that injured Dominic Gene Vargas on

September 15, 2014. These incidents, in chronological order, include, but are not

limited to:

        a)     On November 25, 1998, a methanol cannon exploded and burned

three students at Hart High School in Newhall, California. One student suffered

third-degree burns over 35% of his body, including his hands, face, arms, chest,

shoulder and face. This incident was reported in the Los Angeles Times on

November 29, 1998.

        b)     On August 31, 1999, at East Bakersfield High School in

Bakersfield, California, a small quantity of methanol in a 5-gallon glass bottle

ignited, shot out flame and exploded, shooting glass around the room and

sending 23 people to the hospital. This incident was reported in the Los Angeles

Times, and by the Associated Press, on September 1, 1999 "Methanol Blast in Class Sends 23 to Hospital."

c)      On November 24, 1999, at Waverly High School in Delta Township, Michigan, methanol exploded during a teacher demonstration and caused severe, disfiguring burns to student Christine Jurus. This incident was reported in The Argus Press on November 27, 1999 and by the Associated Press on December 2, 1999, "Student Recovering Group Suggests Better Safety in Science."

d)      On January 28, 2000, at Lakeview High School in Battle Creek, Michigan, a teacher was pouring methanol into a petri dish with some chemical salts when the methanol ignited and injured 1 teacher and 4 students, including Autumn Burton, who suffered severe disfiguring burns. According to the Battle Creek Police Department Report, the teacher stated: "I was conducting an approved chemical demonstration that involves using methanol/wood alcohol and small of amounts of chemical salts"… "for the students to see what colors are generated by the experiment." The teacher had performed this demonstration possibly 20 times before without a single incident. As he was closing the container of methanol, there was a flash up (fireball) that went from his demonstration desk out and into the first and second rows of the classroom. The teacher believed the incident may have occurred because he had the methanol container open too long, allowing a vaporous cloud to form and come into contact with the flame source on his demonstration desk. This incident was reported in the Argus Press on January 29, 2000 and discussed in the Washington Post on

July 14, 2002, "School Lab Incidents Not Rare in US", among other publications.

e)      On October 11, 2001, at Genoa-Kingston High School in Genoa, Illinois, methyl alcohol (methanol) ignited and burned students who were several feet away from the source. Methanol was being poured from a gallon jug when the fire occurred. Seven students were burned, including one who was in critical condition. This incident was reported in the Chicago Tribune on October 12, 2001 "7 Students Burned in Chemistry Class"; and the Daily Herald, Arlington Heights, IL, and On October 12, 2001 in the Daily Chronicle, DeKalb, IL. It was also discussed in an Associated Press article, "Chemistry Labs Scenes of Accidents," in the Amarillo Globe News, among other publications, on July 7, 2002.

f)      On March 11, 2002, at New Berlin West High School in New Berlin, Wisconsin, a teacher combined chlorides with methyl alcohol (methanol) in a series of pie tins before lighting each one. A flash erupted from one of the pans, sending a fireball hurtling into the audience. 4 students were injured. This incident was reported in an article "Chemistry Experiments and Students Sometimes Don't Mix" in the Milwaukee Journal Sentinel on July 27, 2002.

g)      On January 30, 2004, at Federal Way High School in Federal Way, Washington, a science teacher was demonstrating how different metals and chemicals produce multi-colored flames. The teacher didn't realize the methanol in one beaker had already been ignited, because burning methanol produces nearly invisible flames. When she poured more methanol into the container there was an explosion and fire spread to the first two rows of desks. The teacher and two students were injured. One of the students suffered third-degree burns to his

head, face, arms, and hands. This incident was reported in "4 Injured in Federal Way High School Chemistry Lab Fire," KOMO News Network, January 30, 2004, in the Seattle Times, "Federal Way Students Aid Teacher after Science Lab Explosion", January 31, 2004, and in other media reports.

h)     On June 17, 2005 at Huntington Beach High School in Huntington Beach, California, an experiment using methanol exploded and burned two students, including severe disfiguring burns to Brian Cross. The incident was reported in the Huntington Beach Independent, June 23, 2005 ("Fire in Chem Class); the Los Angeles Times, June 18, 2005, ("Teens Burned in Chem Lab Fire"), and The Orange County Register, October 13, 2005 ("District, Teacher Sued Over Burns").

i)     On January 23, 2006, at Western Reserve Academy in Hudson, Ohio, the teacher was performing a "rainbow flame test." The flame in one of the ignited dishes began to diminish and the teacher poured additional methanol onto it from a gallon-size container. The flame flashed back into the container and produced a flamethrower effect. Two students were severely burned. One of those students, Calais Weber, now known as Calais Weber Biery, suffered severe disfiguring burns and later became an advocate for classroom safety and abolition of the "rainbow demonstration." She was featured in a video produced by the United States Chemical Safety Board", "After the Rainbow", released December 10, 2013, and featured on the website of by the defendants' competitor, Flinn Scientific. This incident has been reported and discussed in numerous articles and publications, including, The Cleveland Plain Dealer,

January 27, 2008, "Burned Alive: Survivors' Story of the Western Reserve Academy Lab Accident", and SciLogs International, October 4, 2011, "From Good-Looking to Beautiful: Calais Weber's Story of Tragedy and Triumph".

j)    On June 7, 2007, at Schroeder High School in Webster, New York, a teacher was demonstrating a "flame test" experiment consisting of putting chemicals into dishes, pouring methanol on them and lighting the contents, when a fire erupted. A student, Kristen Laird, suffered third-degree burns on her arms, face and back. This incident was reported in the Democrat Chronicle, Rochester, NY, August 31, 2007 ("Suit for School Lab Accident Spurs Training Program.")

k)    On March 10, 2010, at St. Marcellinus Secondary School in Mississauga, Ontario, Canada, a teacher was holding a one-liter beaker of methanol when the methanol suddenly ignited from a nearby flame. The teacher dropped the container, scattering flames onto students in the front row. Five students and the teacher were injured. The incident was reported in the Mississauga News in articles appearing March 10, 11, 12, and 22, 2010.

l)    On October 26, 2011, at Kerr Middle School in Del City, Oklahoma, a teacher was performing a flame color demonstration when methanol ignited. One student was injured. This incident was reported in The Oklahoman on November 2, 2011, and on Oklahoma News 9 on October 28, 2011.

m)    On November 30, 2011, at Hazeley Academy in Milton Keynes, Buckinghamshire, England, a teacher was rehearsing a demonstration when a fire ball erupted and burned the teacher and the six-year-old son of a fellow teacher. The incident was reported in The Daily Mail, December 1, 2011,

"Science Teacher Sets Self on Fire and Burns Face of Boy, Six, after 'Routine' Experiment Goes Wrong".

n)      On December 1, 2011, at Maple Grove Junior High School in Maple Grove, Minnesota, a teacher was demonstrating experiments using methanol in a large plastic bottle when the vapor ignited. A student, Dane Neuberger, was severely burned. The incident was reported on CBS Minnesota on December 2, 2011 and in the Star Tribune on December 1, 2011, and the Sun Post on June 1, 2012 and other media reports.

o) On March 19, 2012, at Reedsburg Area High School in Reedsburg, Wisconsin, an experiment showing that salt and methanol make different colored flames caused a bigger flash than usual. The fireball traveled more than six feet. Three students and a teacher were burned. The incident was reported in WiscNews on March 21, 2012, "Students, Teacher Hurt in School Fire."

p)      On April 12, 2012, at Mililani High School in Mililani, Hawaii, a teacher was conducting an experiment with methanol when a flash explosion happened in a boy's face. The incident was reported in the Honolulu Star Adertiser, April 12, 2012, "Student Injured in Minor Chemical Explosion at Mililani High."

q)      On April 26, 2012, at Soule Road Middle School in Liverpool, New York, a veteran eighth-grade science teacher was teaching 22 students about the combustibility of methanol when the experiment he was performing exploded. The incident was reported on Syracuse.com on April 27, 2012, "Two Agencies Investigating Soule Road Middle School Explosion."

r)      On November 28, 2012, at Wilson Middle School in Carlisle, Pennsylvania, a teacher attempted to smother a fire in a beaker by pouring isopropyl alcohol into the beaker. Fire shot out of the beaker, injuring seven students. The incident was reported in Pennlive.com on December 1, 2012, "Wilson Middle School Fire: Pennsylvania Law Doesn't Set Lab Safety Standards"; and in The Sentinel (Carlisle, PA) on January 23, 2013, "Fire Chief Releases Investigation Results of Wilson Middle School Fire."

s)      On June 17, 2013, at the Myth Busters Science Camp at St. Scholastica Academy in Covington, Louisiana, students were conducting an experiment using alcohol as a heat source. Something went wrong, triggering an alcohol flash fire, injuring two students. This incident was reported in NOLA.com/The Times Picayune, on June 18, 2013, "Boys Burned During Experiment at Covington Science Camp Remain Hospitalized."

t)      On September 9, 2013, at Roach Middle School in Frisco, Texas, an experiment burning salts involving strontium chloride, methyl alcohol, and a lighter resulted in a small flash fire that injured two students and one teacher. The incident was reported on September 9, 2013 by WFAA.com, "Frisco Students Hospitalized after Science Experiment Catches Fire."

u)      On October 3, 2013, at Chapel Hill High School in Douglasville, Georgia, a group of students, supervised by a teacher, was demonstrating identification of chemicals by the color of their flame when methanol dispensed from the container unexpectedly fast and ignited, catching a 12th grade female student on fire, The incident was reported in The Atlanta Journal Constitution on

October 4, 2013, "Teen Set on Fire Expected to Fully Recover; "on CBS 46 on October 4, 2013, "Douglas County Student Catches Fire in School Accident," and in other media reports.

v)   On November 12, 2013, at La Joya Community High School in Avondale, Arizona, a chemical experiment using different chemicals to produce different color flames went awry, injuring four students and a teacher. The Avondale Fire and Medical Incident Report refers to the flammable liquid as ethyl alcohol. The incident was reported on VPHO on November 12, 2013 "1 Student Released, 1 Still Hospitalized after Science Blast."

w)   On November 25, 2013, at Lincoln Park High School in Chicago, Illinois, a teacher was performing ignition of elements in a chemistry class. When a sample of cobalt in a petri dish did not ignite with a match, the teacher poured methanol over the cobalt and the match, and an explosion occurred. Five students were injured, one seriously. The incident was reported in Courthouse News Service on April 14, 2014, "Chemistry Experiment Set Girl on Fire; and on DNAinfo Chicago on April 17, 2014, "Lincoln Park High School Chem Lab Fire Leads to Lawsuit."

x)   On January 2, 2014, at the Beacon School in Manhattan, New York, a teacher was performing the Rainbow Flame Test. The teacher poured methanol from a gallon container onto four petri dishes that had been aflame moments earlier. A fireball injured two students, one severely. The incident and its aftermath were reported in the New York Times on January 3, 2014. "School Experiment that Burned Boy was Focus of Federal Warning;" The New York Post

on January 2, 2014, "Two High School Kids Burned in Lab Accident;" The New York Daily News on February 10, 2014, "Beacon School Chemistry Teacher Removed from Classroom After In-Class Experiment Injured 2 Students," in the Royal Society of Chemistry", rsc.org, on January 8, 2014, Exploding Demo Injures Chemistry Students", and in numerous other media reports.

Listings of media reports concerning the incidents in this paragraph 45 are by way of example and are not intended to be complete or exhaustive.

35.    The above incidents and reports all occurred prior to the sale of the subject methanol by the defendants to Strive Prep.

36.    The reported similar incidents listed in paragraph 45, above, demonstrate individually and in combination: 1) that methanol is extremely dangerous in high school classrooms and similar settings; 2) that teacher use of methanol in the presence of flames or ignition sources, including pouring methanol from a gallon-sized container on an ignition source, was reasonably foreseeable and was, in fact, known to have occurred; 3) that whatever other efforts by safety-oriented organizations and others were occurring to attempt to keep students safe in the presence of methanol in classrooms, these efforts were unsuccessful and inadequate to abate the hazard presented by methanol, and 4) that the environment in high schools and middle schools into which methanol was being sold was an environment in which tragic and life-altering injuries to students were repeatedly occurring from exposure to methanol.

37.    The incidents listed in paragraph 45, above, and the media and scholarly reporting and commentary concerning the incidents was such that a reasonable

manufacturer or distributor of methanol for use in school classes knew or should have known of these incidents.

38.     At all material times, there was and is no systematic or comprehensive reporting system for classroom incidents like methanol explosions or fires, either on a national level in the United States or on a state level in any state.

39.     At all material times, it was and is believed by agencies responsible for gathering or receiving information concerning incidents causing injuries to consumers, such as the Unites States Consumer Product Safety Commission, that such incidents are drastically underreported.

40.     At all material times, it was and is believed by the Laboratory Safety Institute, a leading organization dedicated to improving laboratory safety in the United States, that laboratory accidents are significantly underreported.

41.     It is likely, and a person or entity with reasonable expertise in the use of chemicals in school classrooms should have known that the similar incidents listed in paragraph 45, above are a subset of all such incidents, and that it is likely there were many additional such incidents that were not reported.

42.     In addition to the reports of individual incidents involving serious injuries to students associated with the use of methanol in classrooms, prior to June 6, 2014, there were numerous reports in the popular press, in science and chemistry education journals and blogs, and in warnings and press releases from a governmental agency that methanol in classrooms presented a serious and on-going hazard to students and teachers.

43.     The items described in the preceding paragraph included, but were not

limited to, the following, listed in chronological order:

a)   July 7, 2002, article by Tammy Webber of The Associated Press,
     "Mishaps in School Labs Reveal Lack of Safety". This article was
     published in multiple media sources including Los Angeles Times,
     The Charlotte Observer, the Amarillo Glove-News, and others.

b)   July 26, 2002 article by Amy Hetzner, Milwaukee Journal Sentinel,
     "Chemistry Experiments and Students Sometimes Don't Mix: New
     Berlin  West Accident One of Many Nationwide in which Youngsters
     are Hurt."

c)   October 29, 2004, National Science Teachers Association, NSTA
     Web News Digest, Science Scope: Scope on Safety:
     "Chemicals:   What's in? What's Out?; stating that certain
     chemicals, including methanol, should be removed from
     middle school science labs or storerooms due to their
     hazardous nature.

d)   August 29, 2005, National Science Teachers Association, NSTA
     Web News Digest, "Flame Tests Performed Safely."

e)   June 24, 2006 Article by Marilyn Miller, Akron Beacon Journal,
     reported in Healthy Schools Network, NewsSlice, June 2006, "Burn
     Victims Support Methanol Ban in Class: Chemistry Accident
     Survivors Urge Teachers to Stop Using Dangerous Chemical in Lab
     Tests."

f)   July 2007, National Science Teachers Association Position
     Statement, "Liability of Science Educators for Laboratory Safety."

g)   2008, Flinn Scientific, Publication No. 10497, "Methyl Alcohol
     Safety."

h)   June 13, 2011, American Chemical Society, Chemical and
     Engineering News, Safety Zone Blog, letter from Robert H. Hill, Jr.

i)   Undated, National Science Teachers Association, "Safe Handling of
     Alcohol in the Laboratory."

j)   January 2013, Publication of the Methanol Institute, Methanol Safe
     Handling Practices, Chapter 8, Section 8.1, Overview of Methanol
     Incidents, showing, despite incomplete reporting, disproportionate
     number of methanol incidents and injuries occurring in schools.

k)   On December 10, 2013, the United States Chemical Safety Board

released a video, "After the Rainbow." www.scb.gov.

l)    January 3, 2014, United States Chemical Safety Board Press
      Release, "Statement from CSB Chairperson Rafael Moure Eraso
      on High School Laboratory Fire in New York City."

m)    January 3, 2014, Chemjobber blog, "Another Accident with the
      "Rainbow Flame Experiment."

n)    January 5, 2014, The Laboratorium blog, "Don't Try This at School."

o)    January 6, 2014, NSTA blog, Kenneth Roy, "Lab Incident at a
      Manhattan High School: Another Hard Safety Lesson to Learn."

p)    January 7, 2014, Jyllian Kemsley, American Chemical Society,
      Chemical and Engineering News, The Safety Zone, "Performing the
      "Rainbow" Flame Test Demo Safety."

q)    January 20, 2014, A. Maureen Roukl, American Chemical Society,
      Chemical and Engineering News. "Safety First."

r)    March 17, 2014, American Chemical Society, Chemical and
      Engineering News, "Safety Alert: The Rainbow Demonstration."

These articles, blog entries and press releases are representative and are not

complete or exhaustive.

44.    Defendants either were aware or in the exercise of reasonable care and

in discharge of their duty to be knowledgeable concerning the expected and

foreseeable uses of their product, should have been aware of the articles, blog

entries and press releases listed in paragraph 54, above, or the substance of

those items.

45.    For many years prior to, and up to and including 2014, it was widely

known and recognized in the education, teaching, and science safety community

that, for reasons and circumstances including those outlined in paragraphs 39

through 42, above, safety training, education, knowledge and practice was

inadequate and lacking in the science teacher community and in schools. Articles and publications reflecting this knowledge and recognition include, but are not limited to, the following, listed here in chronological order:

a)  L. Sinclar, J. Gerlovich, et al, South Carolina Statewide Science Safety Project, Journal of the South Carolina Academy of Science, Vol. 1, Issue 1, Article 5, January 1, 2003, and Literature cited therein.

b)  Jack A. Gerlovich, et al, National Science Teachers Association, NSTA WebNews Digest, "National School Science Safety Indexing Project: A Beginning", August 26, 2005, and Literature cited therein.

c)  James A. Kaufman, Ph.D., Laboratory Safety Institute "Laboratory Safety and Teacher Certification," undated.

d)  National Council on Teacher Quality, "The All-Purpose Science Teacher: An Analysis of Loopholes in State Requirements for High School Science Teachers", December 2010.

e)  June 13, 2011, American Chemical Society, Chemical and Engineering News, Safety Zone Blog, letter from Robert H. Hill, Jr. June 13, 2011.

f)  James A. Kaufman Ph.D., Safety as a Second language" in NSTA WebNews Digest, April 9, 2013.

g)  C.M. Ezrailson, "Danger in the School Science Lab: Are Students at Risk?", Proceedings of the South Dakota Academy of Science, Vol. 92, p.149 (2013) and Literature cited therein.

h)  March 20, 2014 Jean Delfiner, American Chemical Society, Chemical and Engineering News, comment Re: "Safety Alert: The Rainbow Demonstration."

46.  Defendants knew, or in the exercise of reasonable care should have known, that adequate teacher training, education and certification was and is lacking in the United States and that teachers could not be relied upon to safety handle and use their hazardous product methanol in classroom environments.

47.  Because of the hazards involved with methanol when used for fueling

alcohol burners, many school districts and educational authorities, prior to June 2014, banned the use of alcohol burners in schools.

48.     Alcohol burners were and are banned from many schools, for example, throughout the Maryland Public Schools and the New York City Department of Education, because of the very same hazardous properties of methanol that resulted in the incidents of classroom methanol explosions and fires described in paragraph 45, above and in the injuries to the plaintiff Dominic Gene Vargas alleged herein.

49.     Defendants knew or in the exercise of reasonable care should have known of the banning of alcohol burners in many schools due to the same hazardous properties that resulted in the injuries to the plaintiff Dominic Gene Vargas.

50.     The use of methanol in high school classrooms is completely unnecessary for the delivery of a satisfactory curriculum top level college preparatory. Stated another way, a competent, completely satisfactory high school science curriculum can be delivered without any use of methanol.

51.     The gratuitous and unnecessary nature of methanol in high school classrooms is demonstrated by, among other evidence, the complete ban of methanol in all school district facilities by Colorado Springs School District 11, by Safety Standard "Prohibited Use of Methanol (Methyl Alcohol)", which states in part: "School District 11 prohibits the presence or use of this chemical in any school or district owned building."

52.     The worldwide trade organization for the methanol industry is the

Methanol Institute.

53.     The Chief Executive Officer of the Methanol Institute, Greg Dolan, speaking in his official capacity, made the following statement for inclusion in a public statement by the United States Chemical Safety Board: "Like gasoline, methanol is a toxic and flammable chemical and should only be handled in appropriate settings, and that would certainly not include museums and classrooms."

54.     Prior to September of 2014, there was a history of safety recalls of consumer products compromised of ethanol, which is comparable to but less volatile and less hazardous than methanol.

55.     The reasons for the recall of such products comparable to methanol included knowledge and recognition of the exact same hazards that exist with methanol, mainly very high volatility and the tendency to flash back into a container and produce a flame thrower effect.

56.     On April 24, 1991, the United States Consumer Product Safety Commission announced that, in cooperation with the CPSC, a company named LanTec, Inc. was recalling approximately 100,000 32-ounce bottles of alcohol-based Eco-Lite Charcoal Starter. The CPSC announcement stated:

> … The product is much more flammable than ordinary charcoal lighter fluid and, if used or handled improperly around an ignition source, can be dangerous.
>
> Eco-Lite Charcoal Starter is an alcohol-based product that burns faster than other charcoal lighter fluids which are petroleum-based. The product may flash back to the bottle and explode if it is sprayed over hot charcoal. …
>
> The reason for the problem is that Eco-Lite is made of alcohol and

has a low flash point.

Eco-Lite was 80% Ethanol, 3% Methanol, 8% Isopropanol, and 1% Methyl isobutyl Ketone. The MSDS stated that Eco-Lite had a closed cup flash point of 66° F. The CPSC found the flash point to be 56° F.

57.     On June 22, 2011, the United States Consumer Product Safety Commission announced a voluntary recall by Napa Home and Garden of NAPAfire and FIREGEL Gel Fuel bottles and jugs. The gel fuel was an ethanol-based product. The CPSC announcement identified the hazard as: "The pourable gel fuel can ignite quite unexpectedly and splatter onto people and objects nearby when it is poured into a fire pot that is still burning. This hazard can occur if the consumer does not see the flame or is not aware that the fire pot is still ignited".

58.     On September 1, 2011, the CPSC announced a voluntary recall by nine additional manufacturers of pourable gel fuel for the same reasons.

59.     On December 27, 2011, the Unites States Consumer Product Safety Commission issued its "Fire Pots and Gel Fuel; Advanced Notice of Proposed Rulemaking; Request for Comments and Information". ("ANPR") "(Federal Register, Vol. 76, No. 248, p. 80832-80834, December 27, 2011). The CPSC stated: "(The CPSC) has reason to believe that fire pots and gel fuel used together may present an unreasonable risk of injury." The CPSC provided the following details:

> As of September 30, 2011, we are aware of 76 incidents involving fire pots used with gel fuel that resulted in 2 deaths and 86 injuries. In an effort to address this emerging hazard, the CPSC's Office of Compliance and Field Operations initiated several recalls of pourable

alcohol gel fuel. To date, 12 voluntary recalls have been announced recalling more than 2 million bottles of gel fuel. The products involved were alcohol-based gel fuel intended to be used with fire pots.

60.     Further details in the ANPR explained that the gel fuels were approximately 80% alcohol, most commonly ethanol, isopropanol, and ethanol isopropanol mixtures. Analysis determined the flash points to be less than or equal to 74° F. In describing "hazard scenarios", the ANPR stated that in 64% of all reported incidents, consumers were reportedly in the process of, or had just finished, refilling a fire pot when the flame in the fire pot ignited the vapors in the fuel container and an explosion resulted. In 36 of the 49 refueling incidents, the most seriously injured person was not the person refilling the fire pots.

61.     The CPSC's observations contained in the ANPR concerning gel fuels identified hazards substantially similar to those presented by methanol and manifested in the reported classroom methanol incidents.

62.     The four-liter bottle in which the methanol that injured Dominic Vargas was packaged by the defendants did not include a flame arrestor.

63.     Flame arrestors prevent the spread of a fire by disrupting the spread of vapor ignition, by dissipating the heat necessary to propagate vapor ignition.

64.     Flame arrestors have been well known in industries involved in handling of flammable gasses and liquids for many years, including the manufacture of gasoline cans and other containers for flammable substances.

65.     Flame arrestors have been used in many applications for many years to prevent the spread of fires in volatile substances.

66.     In the application suitable for a four-liter bottle of methanol, a flame

arrestor would consist of a screen or screen-like disc just inside the opening of the bottle.

67.     The presence of a flame arrestor would have prevented the ignition from propagating into the bottle and would therefore have prevented the pressurization of the bottle and spewing of its contents that injured Dominic Vargas.

68.     Incorporation of a flame arrestor into the packaging of methanol would have prevented the injuries to Dominic Vargas and the injuries reported in the other incidents listed in the Amended Complaint in Tort for Damages in which methanol spewed from the bottle.

69.     The cost of a flame arrestor for a plastic bottle of methanol was a few cents per bottle.

**FIRST CLAIM FOR RELIEF**

**Strict Product Liability vs. All Defendants**

70.     Plaintiffs incorporate by reference paragraphs 1 through 69 of their Amended Complaint in Tort for Damages.

71.     The defendant, Fisher Scientific Company, L.L.C. designed the subject 4-liter bottle of methanol,  in that it specified the packaging and contents, designated the product formulation, promoted, marketed and sold it for classroom use in a 4-liter bottle, and directed it to educational classroom use.

72.     The defendant Fisher Scientific Company L.L.C. was therefore a "manufacturer" of the 4-liter bottle of methanol within the meaning of Colorado Revised Statute 13-21-401 (1).

73.     The defendant Fisher Scientific Company, L.L.C. sold and distributed the said 4-liter bottle of methanol to Strive Preparatory and is in the business of selling such product for use and consumption.

74.     Defendant Fisher Scientific Company, L.L.C. was therefore also a "Seller" of the product within meaning of C.R.S. 13-21-401 (3).

75.     Defendant Fisher Scientific Company, Inc. also had actual knowledge of the defect in the product in that it knew that methanol is a highly volatile, hazardous product especially when around students in a classroom and that its presence or use in a classroom was unnecessary.

76.     The defendant AquaPhoenix Scientific, Inc. manufactured, fabricated, packaged and labeled the 4-liter bottle of methanol.

77.     Defendant AquaPhoenix Scientific, Inc. manufactured, packaged, and labeled the 4-liter bottle of methanol according to specifications provided by the defendant Fisher Scientific Company.

78.     The recalls and the CPSC's concerns over the hazards presented by ethanol-based products, and the applicability of those concerns to methanol, were known to the defendants, or should have been known to them, had they used reasonable care, prior to June 6, 2014.

79.     Manufacturers of products, including the defendants, as a matter of sound and responsible business practice, must acquire and maintain the knowledge and understanding of an expert, including the hazards of the product, its foreseeable and known uses, including empirically demonstrated uses, the environment in which the product is intended to be used, and the benefits or

necessity, or lack thereof, of use of its product in such environment.

80.      Concerning their manufacturer and distribution of methanol, the

defendants, had they complied with their responsibility as outlined in the

preceding paragraph, would have been aware of the substance of the facts set

out in paragraphs 21 through 71 of this Complaint in Tort for Damages.

81.      As alleged in paragraph above 1, above, on September 15, 2014 the

plaintiff Dominic Gene Vargas was severely burned by methanol from a 4-liter

bottle provided by the defendant, Fisher Scientific Company, L.L.C. At the time of

the injury, a first year chemistry teacher at Strive Preparatory SMART Academy,

Daniel Powell, was attempting to engage students and generate enthusiasm by

using small, ignited amounts of methanol. This was similar to what he had done

on previous occasions in performing a demonstration often referred to as the

rainbow experiment. Mr. Powell attempted to add methanol from the 4-liter bottle

to a small flame when the methanol vapor in the bottle ignited, instantly

pressurized the bottle and projected burning methanol across the room, for a

distance in excess of ten feet, striking the plaintiff Dominic Gene Vargas.

82.      The ignited methanol projected violently from the bottle and across the

room in what Mr. Powell described to investigators as a "flame thrower" effect.

83.      Although he knew that methanol burned easily, Mr. Powell was

completely unaware of and surprised by the projection of flaming methanol from

the bottle and across the room. Thus, Mr. Powell did not fully or adequately

understand the hazards and danger posed by the methanol.

84.      Mr. Powell had previously used an open bottle of methanol in the

presence of flames without incident.

85.     Mr. Powell's supervising teacher, Josh Andert, similarly did not fully or adequately understand the hazards and danger posed by methanol, particularly that it could ignite in the bottle and produce a "flame thrower" effect.

86.     Further, had the bottle been equipped with a flame arrestor, the danger of which Mr. Powell and Mr. Andert were unaware would have been eliminated.

87.     The use of methanol by Daniel Powell at the time the plaintiff was injured was reasonably foreseeable and was essentially identical to the use of methanol in several of the incidents described in paragraph 45, above, with similar results.

88.     Use or misuse of methanol in classrooms, by intentionally or accidentally exposing the vapor to open flames, was at all material times reasonably foreseeable to the defendants, and was empirically demonstrated to occur in many of the incidents referenced in paragraph 45, above.

89.     The defendants were, at all material times, engaged in the business of selling 4-liter bottles of methanol for use in school classrooms.

90.     The defendants sold the subject 4-liter bottle of methanol.

91.     The subject bottle of methanol was defective in that its design, packaging, and marketing for use in school classrooms rendered it unreasonably dangerous for reasonably foreseeable use in classroom settings.

92.     The subject bottle of methanol was defective and unreasonably dangerous to persons, including students like the plaintiff Dominic Gene Vargas, who might reasonably be expected to use or be affected by the bottle of methanol.

93.     The bottle of methanol introduced into the classroom serious hazards of explosion, fire, and severe burns to students, and methanol offered little or no benefit when used in classrooms, and was completely unnecessary for delivery of an excellent secondary school science curriculum.

94.     Therefore, the risks of introducing methanol into classrooms by selling it for classroom use far out-weighed the benefits, and rendered the 4-liter bottle of methanol unreasonably dangerous.

95.     The extreme volatility and nature of the hazard that accompanied methanol in classrooms created a risk of harm to persons that would not ordinarily be expected by users or consumers, and was not expected by the teacher or the plaintiff in this case.

96.     Packaging of a product is part of its design.

97.     The defects in the subject 4-liter bottle of methanol that rendered its unreasonably dangerous for sale to schools included, but were not limited to, the lack of a flame arrestor at the opening of the bottle.

98.     Because the hazard of the product could have been substantially reduced, and the hazard that resulted in injury to Dominic Vargas could have been entirely prevented, by use of a feasible, inexpensive flame arrestor, the risk of the methanol packaged without a flame arrestor substantially outweighed the benefit, if any, of the product so packaged, and the product was therefore unreasonably dangerous.

99.     As a direct and proximate result of the lack of a flame arrestor, the plaintiff Dominic Vargas was injured and the plaintiffs suffered the injuries and

damages alleged in paragraphs 103 and 104 below.

100.    The 4-liter bottle of methanol was defective at the time it was sold by the

defendant and supplied to Strive Preparatory SMART Academy.

101.    The 4-liter bottle of methanol was expected to and did reach the user or

consumer without substantial change in the condition in which it was sold by

each of the defendants.

102.    The plaintiff, Dominic Gene Vargas, as a student at Strive Preparatory

SMART Academy, was a person who would reasonably be expected to use,

consume, or be affected by the 4-liter bottle of methanol.

103.    As a direct and proximate result of the defective and unreasonably

dangerous condition of the 4-liter bottle of Fisher Science Education methanol,

the plaintiff Dominic Gene Vargas suffered severe and permanent injuries

including, but not limited to, the following. He was struck by a stream of burning

methanol on his chest and neck and splattered with burning methanol all over his

body. He sustained third degree burns to his chest, upper arms, neck, face and

ears. He sustained severe second degree burns to his face. He suffered second

and third degree splatter burns to his arms, hands, chest, torso, legs and on his

back. For treatment of his injuries, Dominic Gene Vargas was transported by

ambulance to Denver Health Hospital, where he was triaged and sent by

ambulance to the University of Colorado Hospital Burn Center. He was

hospitalized for 29 days. He was required to undergo intensive care,

debridement, skin grafting including xenographs and autografts, multiple

surgeries, removal of parts of his ears, intubation, sedation, prolonged use of a

urinary catheter, oxygen tubes and feeding tubes, bandaging and dressing changes, and multiple forms of physical, occupational and other therapy. Dominic Gene Vargas suffered extreme and prolonged pain and emotional distress. He suffered prolonged open sores, itching and other pain and discomfort. He suffered severe anxiety, nightmares, fears and disorientation. During his hospitalization, he acquired an infection that was life-threatening. His normal activities were severely disrupted. He missed nearly four months of school and missed almost an entire season of playing high school football. His ability to tolerate normal activities involving exposure to sunlight has been severely impaired. His ability to fully enjoy life has been severely impaired in the past and in the future. Subsequent to his treatment at the University of Colorado, Dominic Gene Vargas has undergone state-of-the-art laser treatments, in an effort to reduce some of his scar tissue.  He incurred travel expenses for himself and his parents to accompany him for these treatments, which are not available in Colorado. Some of his medical and travel expenses were incurred after his eighteenth birthday and his claims include those expenses. He will likely incur additional and such expenses in the future. Due to his injuries, Dominic Gene Vargas has severe and permanent scarring and disfigurement of his ears, face, neck, upper arms, chest, legs, and in splotches throughout his body and extremities. He has suffered, and will continue to suffer, anxiety, humiliation and embarrassment. All of his injuries and damages are a direct and proximate result of the defective and unreasonably dangerous condition of the 4-liter bottle of methanol.

104.     Due to the injuries to their son, plaintiff Dominic Gene Vargas, who was a

minor at the time of his injuries, the plaintiffs Elizabeth Ann Vargas and John

Adam Vargas incurred medical and related expenses, and other expenses on his

behalf.

## SECOND CLAIM FOR RELIEF

### Negligence vs. All Defendants

105.     Plaintiffs in corporate by reference paragraphs 1 through 104 of their

Complaint in Tort for Damages.

106.     The defendants were negligent by failing to use reasonable care to

prevent the 4-liter bottle of methanol from creating an unreasonable risk of harm

to persons who might reasonably be expected to use or be affected by the 4-liter

bottle of methanol while it was being used in the manner the defendant might

reasonably have expected.

107.     The defendants are required to be experts in the properties of their

product, the hazards posed by the product, the environment into which the

product is being introduced, the way their product is being used, reasonably

foreseeable uses of their product and empirical evidence of how its product is

performing in actual uses, including injuries associated with their product and

identical products.

108.     The defendants were negligent in failing to heed the information, set out

in this Complaint in Tort for Damages, about all of the factors listed in the

preceding paragraph.

109.     The defendant Fisher Scientific Company, L.L.C. was negligent in that,

despite the information set out in detail in this Complaint in Tort for Damages, it specified, marketed, promoted, sold and introduced into classrooms the unreasonably dangerous 4-liter bottle of methanol.

110.    The defendant AquaPhoenix Scientific, Inc. was negligent in that, despite the information set out in detail in this Amended Complaint in Tort for Damages, it manufactured, produced, packaged, labeled for educational use and supplied to defendant Fisher Scientific Company, L.L.C. for distribution and use in classrooms the unreasonably dangerous 4-liter bottle of methanol.

111.    The defendants Fisher Scientific Company, L.L.C. and AquaPhoenix Scientific, Inc. were also negligent and failed to use reasonable care in that they packaged the methanol in a bottle that did not have a flame arrestor.

112.    Plaintiff Dominic Gene Vargas was a person whom the defendants should reasonably have expected to be affected by the 4-liter bottle of methanol.

113.    The plaintiff Dominic Gene Vargas suffered injuries, damages and losses as a result of the defendants' negligence, while the 4-liter bottle of methanol was being used in a manner the defendant should reasonably have expected.

114.    The Plaintiffs' respective injuries, damages and losses caused by the negligence of the defendant are more fully set out in paragraphs 103 and 104, above.

**THIRD CLAIM FOR RELIEF**

**Breach of Implied Warranty of Fitness**

**For a Particular Purpose under C.R. S. 4-2-315**

**vs. All Defendants**

115.    Plaintiff incorporate by reference paragraphs 1 through 114 of their

Amended Complaint in Tort for Damages.

116.    At the time the subject 4-liter bottle of methanol was manufactured and

sold by the defendants, the following Colorado statute was in force and effect.

> C.R.S. 4-2-315 Implied Warranty-fitness for particular purpose.
>
> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under section 4-2-316, an implied warranty that the goods shall be fit for such purpose.

117.    The defendants sold the 4-liter bottle of methanol.

118.    The defendants impliedly warranted the 4-liter-bottle of methanol to be

suitable for the particular purpose of foreseeable cases in a high school chemical

class, including uses involving open flames.

119.    Defendants' implied warranty of the 4-liter bottle of methanol for use in a

high school chemistry class arose from its sale of the product to a school as a

science school laboratory supply, Fisher Scientific Company, L.L.C.'s inclusion of

the product on its "Lab Outfitter" recommended list of supplies for a high school

chemistry class, the defendants overall strategy of marketing the methanol to

public schools, the use of the brand Fisher Science Education, and other factors.

120.    Defendant AquaPhoenix Scientific, Inc. endorsed and relied upon the

activities of Fisher Scientific Company, L.L.C. to recommend and sell its product

to the ultimate consumer.

121.    Strive Preparatory relied upon the defendants' skill and judgment to

select or furnish the methanol for classroom use.

122.    As a high school student, the plaintiff Dominic Vargas is a person who was reasonably expected to use, consume or be affected by the 4-liter bottle of methanol.

123.    The 4-liter bottle of methanol was not suitable for the particular purpose for which it was warranted because it was unreasonably unsafe for use in a high school classroom.

124.    Defendants' therefore breached their implied warranty of fitness for a particular purpose.

125.    As a direct and proximate result of the breach of warranty by the defendants, the plaintiffs suffered the injuries, damages and losses described in paragraphs 103 and 104, above.

126.    Within a reasonable time after the plaintiff discovered or should have discovered the breach of warranty, the plaintiff notified the defendants of such breach by filing and serving this Complaint in Tort for Damages.

127.    By contracting for and collaborating in the design, bottling, packaging, labeling sale and distribution of the 4-liter bottle of methanol for use in schools, the defendants consciously conspired and deliberately pursued a common plan or design to commit tortious acts, i.e. the introduction of the unreasonably dangerous product in schools, and breaching their implied warranty of fitness for a particular purpose.

128.    The defendants are therefore jointly liable for the plaintiffs' damages pursuant to C.R.S. 13-21-111.5 (4).

Wherefore, plaintiffs pray this Court for damages against the defendants,

Fisher Scientific Company, L.L.C., and AquaPhoenix Scientific, Inc., jointly and severally as follows:

1) Plaintiff Dominic Gene Vargas prays this Court for damages in an amount sufficient to fully and fairly compensate him for his injuries, damages and losses as described herein;

2) Plaintiffs Elizabeth Ann Vargas and John Adam Vargas pray this Court for damages in an amount sufficient to fully and fairly compensate them for medical and related expenses incurred on behalf of the plaintiff Dominic Gene Vargas while he was a minor, and;

3)   All plaintiffs pray this Court for interest from the date of the injury or to the maximum extent allowed by law, costs including expert witness fees and deposition expenses, and such other and further relief as the Court may deem appropriate.

PLAINTIFFS DEMAND TRIAL TO A JURY

Dated this 21st day of March, 2017

/s/: James A. Cederberg
James A. Cederberg
Cederberg Law Firm, P.C.
Attorney for Plaintiffs
1200 28th Street, Suite 302
Boulder, CO 80303
303-499-0449
303-499-0542 (Fax)

Plaintiffs' address:

Dominic Gene Vargas
1455 South Newton Street
Denver, CO  80219

Elizabeth Ann Vargas
1455 South Newton Street
Denver, CO  80219

John Adam Vargas
5711 Clay Street
Denver, CO  80221

## <u>CERTIFICATE OF SERVICE</u>

I certify that the above and foregoing **AMENDED COMPLAINT IN TORT FOR DAMAGES** was served upon the parties hereto via PACER this 21st day of March, 2017, addressed to:

Attorneys for Defendant Fisher Scientific Company, LLC
Melissa A. Ogburn
Jessie Marie Fischer
Nixon Shefrin Hensen Ogburn, P.C.
5619 DTC Parkway
Suite 1200
Greenwood Village, CO 80111-3061

Attorneys for Defendant AquaPhoenix Scientific, Inc.
James B. Powers
Jane Bendle Lucero
Harris, Karstaedt, Jamison & Powers, PC-Englewood
10333 East Dry Creek Road
Suite 300
Englewood, CO 80112
jlucero@hkjp.com

/s/ Ashley Byrd